Filed 9/17/15  P. v. Rollen CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VAN KEYSHONE ROLLEN,<br><br>    Defendant and Appellant. | D067473<br><br> (Super. Ct. No. INF1201849)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on September 4, 2015, is modified as

follows:

On page 2, the second sentence of the second paragraph is deleted and replaced

with the following text:

> However, we modify his sentence to vacate one of Rollen's
> section 667 enhancements, and remand the case for a determination
> regarding Rollen's entitlement to presentence custody credits.

On page 27, the last sentence in the second full paragraph is deleted and replaced with the following text:

> We therefore vacate one of these two five-year enhancements. (See *People v. Jones* (2015) 236 Cal.App.4th 1411, 1417.)

On page 29, the two paragraphs under DISPOSITION are deleted and replaced with the following text:

> Rollen's sentence is modified to vacate one of the section 667 enhancement terms imposed with respect to his robbery convictions in 2000.  The case is remanded to the trial court for a determination as to Rollen's entitlement to presentence custody credits.  The trial court shall amend the abstract of judgment (1) to reflect the vacating of one of Rollen's section 667 enhancements, and (2) to reflect the calculation of Rollen's presentence custody credits.  The trial court shall forward a copy of the amended abstract of judgment to the Department of Correction and Rehabilitation.
>
> In all other respects, the judgment is affirmed.

The petition for rehearing is denied.

This modification changes the judgment.

McDONALD, Acting P. J.

Copies to:  All parties

2

Filed 9/4/15  P. v. Rollen CA4/1 (unmodified version)
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. VAN KEYSHONE ROLLEN, Defendant and Appellant. | D067473 (Super. Ct. No. INF1201849) |

APPEAL from a judgment of the Superior Court of Riverside County, Richard A. Erwood, Judge.  Affirmed as modified, and remanded for further proceedings.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Felicity Senoski, and Junichi Semitsu,  Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

On appeal, Van Keyshone Rollen raises five claims: (1) that the prosecutor engaged in racial discrimination in the exercise of her peremptory challenges during jury selection and that the trial court committed reversible error by denying Rollen's motions pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, contesting three of the prosecutor's peremptory challenges; (2) that the trial court abused its discretion in denying the defense request to be permitted to impeach a witness with evidence that the witness had appeared at the courthouse intoxicated on the day he was summoned to testify; (3) that the court abused its discretion in denying Rollen's motion to either reduce his single felony conviction to a misdemeanor, or to strike his prior strike convictions; (4) that the court erred in imposing four, rather than three, five-year enhancements pursuant to Penal Code[1] section 667; and (5) that the court erred in failing to calculate the number of presentence custody credits to which Rollen is entitled.

We affirm Rollen's convictions. However, we modify his sentence to stay the sentence on one of the section 667 enhancement terms and remand the case for a determination regarding Rollen's entitlement to presentence custody credits.

_____

[1]     All further statutory references are to the Penal Code unless otherwise specified.

2

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

In July 2012, Erin Overly was living in a residence in Desert Hot Springs. Rollen and Overly were acquaintances. On July 25, 2012, Rollen came to Overly's residence and Overly let him in. Rollen left that day, but returned the following day, and he and Overly used methamphetamine together. In the early morning hours of July 27, Overly noticed that Rollen was in the yard of the residence. Overly, who was with Matthew Smith and Kenneth Collins at the time, told Rollen to leave. When Rollen refused, Overly called the police.

Desert Hot Springs police responded to a call from Overly's address at about 5:00 a.m. on July 27. As officers approached the residence, they encountered Rollen in a hammock in the front yard. When Rollen saw the police officers, he ran inside the residence. The officers, with their guns drawn, ordered Rollen to come out of the residence multiple times. The officers could hear a woman screaming from inside the residence. Rollen eventually came out of the house. When officers took hold of Rollen's arms, he became uncooperative. The officers forced Rollen to the ground and placed him in handcuffs. Rollen was taken to jail, cited, and released.

After being released from custody, Rollen returned to Overly's residence. Rollen knocked on the door, but no one answered. He went around to the back of the residence, kicked in a door, and entered the residence. Overly, who was inside the residence with

3

Smith and Collins, told them to call the police and then left through the front door. Smith also left the house. Collins called 911. Collins's call with a 911 dispatcher was interrupted when Rollen punched Collins in the mouth. The punch shattered Collins's top denture and knocked it out of his mouth.

After striking Collins, Rollen left the house and confronted Overly in front of the house. Collins testified that he heard Rollen say something like, "You called the cops on me, bitch." Rollen hit Overly, and she fell to the ground. Rollen then walked off. Collins called 911 a second time, this time from a neighbor's telephone, because Rollen had damaged Collins's telephone.

The police responded to Collins's calls at approximately 6:50 a.m. Officers saw Rollen walking in the neighborhood and detained him. Rollen was uncooperative. He clenched his fists, stiffened his legs, and refused to stand or walk, making it difficult for the officers to arrest him. They had to carry Rollen 15 to 20 feet in order to place him in the patrol car.

Overly, in the meantime, was on the ground in front of the residence. She had red marks on her neck and was crying. Paramedics treated Overly at the scene, and police officers contacted Smith and Collins, who did not appear to be under the influence of any substances at that time.

At trial, Rollen testified that he went to the residence in order to use drugs with Overly. According to Rollen, after he and Overly ingested methamphetamine over a period of approximately two days, Overly asked him whether he could obtain more

4

drugs. He did so and returned to the residence. After they had used all of the drugs that Rollen had obtained, Overly asked him to leave, but told him that he could rest on the hammock outside. A short time later, while Rollen was lying in the hammock, police arrived. He panicked and ran inside the house, but soon "gave up."

Upon being arrested, Rollen told police officers that if he was being detained for trespassing, then everyone in the house should be detained, as well.

After being released by police, Rollen returned to the residence to retrieve his backpack. Smith greeted him and told him that it was not a good time for him to be there because Overly and Collins were arguing. According to Rollen, Smith told Rollen to meet him at the back door. Smith then allowed Rollen to enter the residence through the back door. When Overly saw Rollen, she told Collins to call the police.

Rollen denied hitting Collins or breaking his telephone, and also denied having engaged in an altercation with Overly outside of the residence. According to Rollen, when Overly saw him outside, she began to walk backward and tripped over a rock. Rollen said that he grabbed her in order to break her fall.

With respect to Rollen's conduct toward the police officers, Rollen said that officers saw him walking down the street and "tackled" him. He added that he was frustrated with the officers because he had not done anything wrong.

The defense also put on evidence that the owner of the residence had a caretaker with power of attorney, and that the caretaker had not rented the property to anyone for

5

the month of July 2012, when this incident occurred, suggesting that Overly had not been living in the residence legally.

Smith was recalled and testified that he never told Rollen to meet him at the back door of the residence. Smith also denied letting Rollen into the residence. Smith reiterated that Rollen had kicked in the back door to gain entry.

B.   *Procedural background*

On June 17, 2013, the Riverside County District Attorney filed a third amended information charging Rollen with seven felony and misdemeanor counts, as follows: (1) residential burglary while another person, not an accomplice, was present (§§ 459, 667.5, subd. (c); count 1); assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2); unlawful attempt to dissuade a witness from reporting a suspected crime (§ 136.1, subd. (b)(1); count 3); misdemeanor battery (§ 242; count 4); misdemeanor damage to a wireless device with intent to prevent its use to notify law enforcement of a crime (§ 591.5; count 5); misdemeanor trespass (§ 602, subd. (m); count 6); and misdemeanor resisting arrest (§ 148, subd. (a)(1); count 7). In addition, the district attorney alleged that Rollen had suffered a prior conviction for robbery in 1996, two prior convictions for robbery in 2000, and a prior conviction for uttering criminal threats in 2011 (§§ 667, subds. (a), (c), (e)(1), and 1170.12, subd. (c)(1).). It was also alleged that Rollen was in violation of his probation in connection with his 2011 criminal threats conviction.

6

A jury convicted Rollen on counts 3, 4 and 7. The jury acquitted Rollen on counts 1, 2 and 5, and was unable to reach a verdict with respect to a lesser included offense as to count 2.[2] The court declared a mistrial as to this offense.

In a bifurcated proceeding, the trial court found true the prior conviction and probation violation allegations against Rollen.

Prior to sentencing, Rollen filed a motion seeking to reduce count 3 to a misdemeanor and/or to strike his prior strike convictions. The trial court denied the motion and sentenced Rollen to state prison for an indeterminate term of 25 years to life, plus a determinate term of 20 years, consisting of four five-year serious prior felony enhancements.

Rollen filed a timely notice of appeal.

### III.

### DISCUSSION

A.  *The trial court did not err in denying Rollen's* Batson/Wheeler *motion*

Rollen contends that the trial court failed to provide any analysis in its ruling denying his *Batson/Wheeler* motion, which defense counsel made after the prosecutor exercised peremptory challenges against three potential jurors with Hispanic surnames. According to Rollen, the trial court erred in denying his *Batson/Wheeler* motion with respect to two of the potential jurors. Rollen maintains that the prosecutor's reasons for

---

2     Earlier in the proceedings the trial court had granted the prosecutor's motion to dismiss count 6.

excusing the potential jurors was pretextual, and that the real reason the prosecutor excused them is because they were Hispanic.

1.   *Additional background*

On the second of three days of voir dire, defense counsel objected to the prosecutor's use of a peremptory challenge with respect to prospective juror Mr. L. During a discussion in chambers, defense counsel stated, "I do think that there's a pattern going on."  Counsel proceeded to argue that the prosecutor had used her peremptory challenges to "exclude three people with Hispanic surnames."  Specifically, defense counsel noted that the prosecutor had used additional peremptory challenges to remove a "Ms. [V.]" and a "Mr. [T.]" from the jury on the first day of voir dire.

In response, the prosecutor explained:

> "[T]he People made this request [to exclude Mr. L.] as a [peremptory] exclusion based on the fact, when he was being questioned by [the] defense specifically, he said multiple times that he was having trouble with this, he was having trouble, the idea of making a decision, speaking in public.  At one point he said this was too much, and then eventually he comes back and says, 'Yeah, I'm okay.'  But this was also after specifically he said, 'This is too much pressure.'  And the People felt that he would not be able to deliberate strongly, voice his own opinions.  And that was the purpose of the [peremptory] exclusion."

The prosecutor asked to review her notes further with respect to the other prospective jurors that the defense had mentioned, but also said, "Out of memory for Ms. [V.], . . . Your Honor, it may be a Hispanic surname, but, quite honestly, I thought she was Caucasian.  The People excluded her because of her youth and lack of participation

8

in the conversation that I had during voir dire."  The prosecutor went on to say, "[T]he very last one I would have to pull my notes, honestly.  I do remember he was very quiet and not responding to counsels' questions.  [¶]  So those were my reasons for asking for them to be excused."

The trial court concluded that the prosecutor had provided adequate justification for exercising a challenge to prospective juror Mr. L.  The court noted that "he was all over the place as to whether or not he could be fair," and that "he was worried about saying the wrong thing."

After the prosecutor had the opportunity to review her notes, she elaborated that she had excused prospective jurors Ms. V. and Mr. T. based on their "lack of participation in the voir dire process," and because of their "low level of education and youth."  The prosecutor again explained that she believed that Ms. V. had blond hair, and it was the prosecutor's impression that Ms. V. was Caucasian.  Defense counsel disputed the prosecutor's reasons, and continued to argue that the prosecutor had excluded prospective jurors Ms. V. and Mr. T. because of their Hispanic surnames.

The trial court concluded, "Well, with respect—I don't think you've carried the burden of a prima facie showing, even though the prosecution has already given her reasons for excluding those members of the jury panel.  So I don't find any purposeful use of a peremptory challenge on racial grounds.  And I'm going to deny your *Wheeler/Batson* motion at this time.  That's without prejudice to bring it up again if you

9

feel that the prosecution is doing what you've alleged that she's doing."  Defense counsel

did not raise the issue again.

  2.  *Analysis*

  "Both the state and federal Constitutions prohibit the use of peremptory challenges

to remove prospective jurors based on group bias, such as race or ethnicity.  (See [*Batson,*

*supra*, 476 U.S. at p. 97]; [*Wheeler, supra*, 22 Cal.3d at pp. 276-277].)"  (*People v. Davis*

(2009) 46 Cal.4th 539, 582.) "Doing so violates both the equal protection clause of the

United States Constitution and the right to trial by a jury drawn from a representative

cross-section of the community under article I, section 16 of the California Constitution."

(*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).)

  A party who contends that his or her opponent is utilizing his peremptory

challenges in a discriminatory fashion may raise a motion pursuant to *Batson* and

*Wheeler*.  In *People v. Riccardi* (2012) 54 Cal.4th 758 (*Riccardi*), the Supreme Court

outlined the well-established three-step process that governs a trial court's analysis of a

*Batson/Wheeler* motion:

> "Procedures governing motions alleging the discriminatory use of
> peremptory challenges are settled.  'First, the defendant must make
> out a prima facie case "by showing that the totality of the relevant
> facts gives rise to an inference of discriminatory purpose."
> [Citation.]  Second, once the defendant has made out a prima facie
> case, the "burden shifts to the State to explain adequately the racial
> exclusion" by offering permissible race-neutral justifications for the
> strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is
> tendered, the trial court must then decide . . . whether the opponent

10

of the strike has proved purposeful racial discrimination." ' "
(*Riccardi*, *supra*, at p. 786.)

The *Riccardi* court explained the factors that a trial court may consider in determining whether a prosecutor has acted with discriminatory intent in exercising a peremptory challenge:

> " '[T]he critical question in determining whether a [defendant] has proved purposeful discrimination' at a third-stage inquiry 'is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." [Citation.] In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] ' "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " ' " (*Riccardi, supra*, 54 Cal.4th at p. 787.)

A reviewing court applies a deferential standard of review in analyzing a trial court's finding of fact on the "ultimate question" of whether a prosecutor acted with discriminatory intent in exercising a peremptory strike:

> "[B]ecause the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal ' "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and

11

will not be overturned unless clearly erroneous.' " (*Riccardi, supra*, 54 Cal.4th at p. 787.)

Recently, in *People v. Scott* (2015) 61 Cal.4th 363, 387 (*Scott*), the Supreme Court "clarif[ied] [the] practice" for reviewing *Batson/Wheeler* motions. In *Scott*, the Supreme Court concluded that "where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*Scott, supra*, 61 Cal.4th at p. 391.)

At oral argument, the People took the position that under *Scott,* this framework should apply in the case before us, such that we should begin our analysis of the trial court's denial of appellant's *Batson/Wheeler* motion with a review of the first-stage ruling. We disagree. The *Scott* court identifies and distinguishes the situation in the present case from the situation the Supreme Court was addressing in *Scott*, stating, "When a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate questions of purposeful discrimination." (*Scott, supra*, 61 Cal.4th at p. 387, fn. 1, citing *People v. Arias* (1996) 13 Cal.4th 92, 135 ["The court cannot undo an implied ruling once made by stating after explanations have been received that it never

12

intended to find a prima facie case"].)  Here, although the trial court ultimately stated that it believed defense counsel had not made a prima facie showing, the trial court did not make this statement until *after* the prosecutor had offered explanations for the challenges. Therefore, for purposes of Rollen's appeal, we "infer an 'implied prima facie finding' of discrimination" and review the trial court's ultimate finding that the prosecutor did not act with discriminatory intent in exercising peremptory challenges as to prospective jurors Ms. V. and Mr. T.  (*Scott, supra,* 61 Cal.4th at p. 387, fn. 1.)[3]

With respect to Ms. V., the prosecutor first explained that she had been under the impression that this prospective juror was not Hispanic, but rather, Caucasian.  If the prosecutor did not think that Ms. V. was, in fact, Hispanic, then her reason for excusing that potential juror could not have been based on purported racial bias, as the defense suggested.

In addition, the prosecutor stated that she excused Ms. V. and Mr. T. because of their "lack of participation in the voir dire process" and "low level of education and youth."  The "law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality.  The evidence may range from the

---

3      Rollen asserts only that the trial court provided no analysis of the prosecutor's reasons for challenging prospective jurors Ms. V. and Mr. T., arguing that the deference normally accorded to a trial court's determinations as to the prosecutor's credibility and demeanor is unwarranted when the trial court fails to provide "explicit findings or . . . on-the-record analysis of the prosecution's stated reasons for a strike."  (*People v. Williams* (2013) 56 Cal.4th 630, 717 (dis. opn. of Liu, J.).)  Rollen does not appear to be challenging the trial court's *Batson/Wheeler* ruling with respect to prospective juror Mr. L.

obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) In addition, " '[j]urors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias.' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.) The proper focus of a *Batson/Wheeler* inquiry is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, and not on the objective reasonableness of proffered reasons. (*Purkett v. Elem* (1995) 514 U.S. 765, 769.) The trial court was in the best position to assess the prosecutor's credibility, and there is nothing in this record that undermines the trial court's implicit determination that the prosecutor provided subjectively genuine race-neutral reasons for excusing the identified jurors.

Further, despite Rollen's suggestion that the trial court's ruling does not deserve the typical deference accorded to a trial court's credibility determination on a *Batson/Wheeler* motion because the court failed to make express findings or provide analysis, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919; see also *People v. Mai* (2013) 57 Cal.4th 986, 1054 ["[W]e have made clear that 'the trial court is not required to explain on the record its ruling on a *Batson/Wheeler* motion. [Citation.]' "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the

14

prosecutor or make detailed findings." ' "].) Thus, despite the trial court's lack of analysis of the prosecutor's reasons, we still "presume the advocate uses peremptory challenges in a constitutional manner, and [we] defer to the trial court's ability 'to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' " (*Lenix*, *supra*, 44 Cal.4th at p. 626.)

In exercising her peremptory challenges to excuse prospective jurors Ms. V and Mr. T., the prosecutor relied on observations of the demeanor of both potential jurors during voir dire, combined with her view of these potential jurors' relative youth and lack of education. The record does not contradict the prosecutor's stated permissible, race-neutral reasons. The trial court therefore did not err in implicitly accepting the prosecutor's race-neutral reasons for excusing Ms. V. and Mr. T., and denying Rollen's *Batson/Wheeler* motion.

B.     *The trial court committed harmless error in denying the defense's request to be permitted to impeach Collins with evidence that he had been at the courthouse intoxicated on the day he was originally scheduled to testify*

Rollen contends that the trial court prejudicially erred when it excluded evidence that Collins had arrived at the courthouse intoxicated on the date he was originally scheduled to testify.

1.     *Additional background*

On the first day Collins came to court to testify against Rollen, the prosecutor suspected that Collins was intoxicated. The prosecutor decided against having Collins testify that day, and requested that Collins take a breath test, which ultimately confirmed

15

that Collins was very intoxicated. His test results showed that he had a blood alcohol level of .114 to .122. The following day, outside the presence of the jury, the prosecutor informed the trial court and defense counsel about what had happened the day before with respect to Collins. The prosecutor noted that Collins was present and sober. The prosecutor asked the court to limit defense questioning of Collins regarding his drinking prior to coming to court the previous day.

Defense counsel argued that he should be permitted to question Collins about the incident because Collins's conduct was relevant for purposes of impeachment. Defense counsel argued that Collins's conduct demonstrated that he did not believe that the case was very important. Although the record does not disclose exactly what the prosecutor told the court and defense counsel about Collins's intoxication the previous day, defense counsel argued to the trial court that Collins had "apparently . . . lied about how much alcohol he had taken," in that "he said he had taken a 24-ounce beer. That should have raised his blood alcohol level at the maximum to .04, .05 in the best case scenario. The PAS test came out to .114 and .122. So that's 50 percent over the legal limit to drive."[4]

The trial court concluded, "I'm not going to allow you to question him about coming to testify yesterday, because we didn't get to him. And so the fact that he was under the influence yesterday to such an extent it would be illegal for him to drive, that has no relevancy to his giving testimony today. [¶] You can ask him whether or not he's

_____

[4]     It is not clear from the transcript exactly what Collins had said, or to whom Collins had been speaking, with respect to the comment that defense counsel attributed to Collins regarding having imbibed "a 24-ounce beer" the previous day.

16

intoxicated today and had any intoxicating substance, and the last time he's had it—when was the last time he had an alcoholic drink prior to testifying. You can ask him those questions. But the fact that somebody in the past has used alcohol prior to testifying has no relevance unless it's going to affect the testimony today."

After defense counsel again argued that he believed Collins' answer to the question whether he thought the proceedings were serious enough to be sober when summoned to testify would be relevant, the trial court ruled that no such questioning would be permitted. The court noted that defense counsel would be permitted to ask Collins a number of other questions, however: "You can ask him if he had a drink or if he's a drug user; the last time he's had drugs; whether or not he's had anything this morning that would affect his ability [to testify]; has he had any alcohol this morning; has he had any drugs this morning prior to testifying."

During Collins's direct examination, Collins acknowledged that at the time of the incident, he was homeless, and admitted that he had used drugs "earlier in the evening" of the incident involving Rollen. Later, the prosecutor asked Collins whether his use of methamphetamine earlier that evening had "cloud[ed] [his] memory." He responded, "No." The prosecutor then asked Collins whether he had consumed any alcohol that morning (i.e., the morning of his testimony). After Collins replied, "No," the prosecutor asked, "When's the last time you had any alcohol." Collins responded, "For the first time in eight months, I drank a beer yesterday afternoon." The prosecutor proceeded to review

17

Collins's criminal history with him, and Collins acknowledged having suffered a number of misdemeanor and felony convictions for petty theft, burglary, and forgery.

On cross-examination, defense counsel asked Collins more about his drug habit/addiction, as well as whether his chronic use of drugs had "impaired [his] ability to perceive certain events." Collins "agree[d] to that," generally, but disagreed that his drug use had impaired his ability to know what he had seen and experienced on the night of the incident in question.

Later, defense counsel asked Collins again whether he had had alcohol the day before. Collins answered in the affirmative. Defense counsel then asked, "And you were subpoenaed to be here in court yesterday; right?" The trial court sustained the prosecutor's objection to that question. Defense counsel questioned Collins about whether he had used alcohol or drugs on the morning of his testimony, and questioned him further about his criminal convictions and the events during the incident in question.

2. *Analysis*

Only relevant evidence is admissible (Evid. Code, §§ 210, 350), "and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)" (*People v. Heard* (2003) 31 Cal.4th 946, 973.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) Further, with respect to determining the credibility of a witness, the jury may consider any matter

18

that has a tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to: a witness's character for honesty or veracity or their opposites; the existence or nonexistence of a bias, interest, or other motive; his attitude toward the action in which he testifies or toward the giving of testimony; and his admission of untruthfulness. (Evid. Code, § 780.) "We review for an abuse of discretion the trial court's rulings on the admissibility of evidence." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)

We agree in part with the trial court's assessment that "the fact that somebody in the past has used alcohol prior to testifying has no relevance unless it's going to affect the testimony today." However, this situation did not involve simply a person who admitted to having used alcohol "in the past," but rather, a victim/witness who arrived at court intoxicated on the day he was summoned to testify. Although the fact that Collins became intoxicated on the day he was scheduled to testify did not necessarily provide insight into "[h]is attitude toward the action . . . or toward the giving of testimony" (Evid. Code, § 780), it might have. Further, the circumstances of Collins's drinking led to questions regarding his truthfulness about that episode. Specifically, Collins testified under oath on direct examination that he had had consumed only one (albeit large) beer the day before. However, his blood alcohol was such that the veracity of his statements about having had only one beer could have been fairly called into question. We are therefore not convinced that all questions going to Collins's having become intoxicated

19

on the day that he was originally scheduled to testify were wholly irrelevant, particularly for purposes of impeachment.

However, even if the trial court abused its discretion in prohibiting defense counsel from questioning Collins about his drinking, particularly after Collins opened the door to questions about the subject when he stated on direct examination, "For the first time in eight months, I drank a beer yesterday afternoon," we are not persuaded that the court's ruling prejudiced Rollen. The erroneous exclusion of evidence is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See, e.g., *People v. Marks* (2003) 31 Cal.4th 197, 226–227.) Under this standard, if a trial court erroneously excludes evidence, a defendant must show on appeal that it is reasonably probable that he or she would have received a more favorable result if that evidence had been admitted. (*People v. Watson*, *supr*a, at p. 836.)

The jury was presented with other evidence that called into question Collins's credibility, including far more significant evidence bearing on whether Collins was a credible witness regarding the incident in question. Collins admitted that he used methamphetamine regularly, and that he had consumed it on July 26. Collins also admitted to his lengthy criminal history—a criminal history that included forgery. Given the fact that the jury was well aware of Collins's history of drug use and criminal activity, it is not reasonably probable that the jury would have reached a result more favorable to Rollen if the trial court had not prevented defense counsel from questioning Collins about his intoxication at the courthouse the day before he testified.

20

C. *The trial court did not abuse its discretion in denying Rollen's motions to reduce his felony conviction to a misdemeanor and/or to strike his prior strike convictions*

Rollen contends that the trial court abused its discretion in denying his motion to either reduce his felony conviction for dissuading a witness or victim to a misdemeanor for purposes of sentencing, or alternatively, that the court abused its discretion in failing to strike his prior strike convictions in the interests of justice.

1. *Additional background*

Rollen filed a motion in which he requested that the trial court either reduce his conviction for dissuading a witness or victim from a felony to a misdemeanor, or, in the alternative, exercise its discretion and strike Rollen's prior strike convictions. The People opposed both requests.

In addressing the portion of Rollen's motion in which he sought a reduction of the felony to a misdemeanor, the trial court noted that Rollen had engaged in related conduct in which he struck Collins with such force that Collins's top denture was knocked out of his mouth. The trial court recounted Rollen's testimony, noting that Rollen appeared to believe that he had done nothing wrong, and instead blamed others for his conduct. The court also mentioned that Rollen could have been considered a Three Strikes offender in 2011 when he was convicted of uttering criminal threats, but that he had not been charged under the Three Strikes law. The trial court believed that Rollen had "been given plenty of breaks," but "doesn't want to play by the rules. He doesn't want anybody telling him

21

what to do. He has not shown one reason why I should exercise my discretion to reduce [the wobbler felony offense] to a misdemeanor. And I'm going to decline to do that."

With respect to Rollen's prior strike convictions, before the trial court denied Rollen's alternative request to have two of his strikes stricken, the court considered Rollen's criminal history and the facts of his current offenses. Rollen had committed six felony offenses, beginning in 1993. He had three prior robbery convictions, as well as numerous misdemeanor convictions and parole violations. Rollen had not worked since 2006, and "had not done anything to help himself." Based on Rollen's criminal history, his lack of effort to make any real change, and his testimony at trial, the court concluded that Rollen fell squarely within the spirit of the Three Strikes law, and declined to strike any of Rollen's prior strikes.

2. *The trial court did not abuse its discretion in denying Rollen's request to reduce his felony conviction to a misdemeanor*

"[A] special class of crimes involving conduct that varies widely in its level of seriousness" is "commonly referred to as 'wobbler[s].' " (*People v. Park* (2013) 56 Cal.4th 782, 789.) These offenses "are chargeable or, in the discretion of the court, punishable as either a felony or a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine. (§ 17, subd. (b); *People v. Feyrer* (2010) 48 Cal.4th 426, 430, 433, fn. 4.)" (*Park, supra*, at p. 789.)

"[S]ection 17[, subdivision] (b), read in conjunction with the relevant charging statute, rests the decision whether to reduce a wobbler solely 'in the discretion of the

22

court.'  By its terms, the statute sets a broad generic standard.  [Citation.]  The governing canons are well established: 'This discretion . . . is neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.' "  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977 (*Alvarez*).)  " '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "  (*Ibid.*)

"On appeal, two additional precepts [regarding a trial court's exercise of discretion] operate: 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'  [Citation.]  Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' "  (*Alvarez*, *supra*, 14 Cal.4th at pp.977-978.)

"[T]hose factors that direct similar sentencing decisions are relevant [in the exercise of discretion under section 17, subdivision (b)], including 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.'

23

[Citations.] When appropriate, judges should also consider the general objectives of sentencing such as those set forth in California Rules of Court, rule [4.]410." (*Alvarez*, *supra*, 14 Cal.4th at p. 978.) Ultimately, "any exercise of [discretion under section 17, subdivision (b)] must be an intensely fact-bound inquiry taking all relevant factors, including the defendant's criminal past and public safety, into due consideration." (*Id*. at pp. 981-982.)

Applying these discretionary standards to Rollen's case, we conclude that he has not satisfied his burden on appeal to demonstrate that the trial court's sentencing decision not to reduce his wobbler to a misdemeanor for purposes of sentencing was irrational or arbitrary. Rollen acted violently toward the victim during the incident,[5] and showed no insight into his role in the offenses for which he was convicted when he testified at trial, instead blaming others for the incident. Further, Rollen has a lengthy and serious criminal history. As the trial court noted, Rollen has been provided other opportunities to modify his conduct and yet has continued to engage in criminal behavior.

We are not persuaded by Rollen's argument that the trial court "focused on the fact that if it reduced the offense to a misdemeanor, appellant would have to be placed on probation." Rollen appears to be suggesting that the trial court somehow erred because

---

[5]     Rollen contends that the trial court focused on the "wrong factual issues" with respect to this offense because the basis for Rollen's conviction for dissuading a witness or victim was "appellant's act of yelling at Collins to get off the phone," not Rollen's act of hitting Collins, for which Rollen was convicted of misdemeanor battery. However, when viewed together, the conduct underlying both offenses clearly may be classified as "violent" in nature.

24

the court was unwilling to make a discretionary sentencing decision that would result in Rollen not having to serve some time in prison. However, this type of exercise of discretion is precisely what section 17, subdivision (b) contemplates. The trial court believed that, given all of the circumstances of the offense and the other criminal conduct in which Rollen engaged during the incident, as well as Rollen's lengthy criminal history and the prior opportunities that he had been given but squandered, a sentence requiring Rollen to serve time in prison was the most appropriate sentence, even if that prison term would be quite lengthy. We conclude that the trial court acted well within its discretion in declining to reduce Rollen's felony conviction for dissuading a witness or victim to a misdemeanor.

3. *The trial court did not abuse its discretion in denying Rollen's request to strike his prior strikes*

Rollen's alternative argument is that the trial court abused its discretion in not striking his two prior strikes as requested in his *Romero* motion.[6]

The law governing a trial court's consideration of whether to dismiss a prior strike conviction is well established: "[T]he court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence

---

[6]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

25

should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

In *People v. Leavel* (2012) 203 Cal.App.4th 823, 837, this court summarized the standard of review to be applied in reviewing a trial court's ruling on a motion to dismiss a prior strike conviction:

> "The court's ruling on a motion to strike is subject to a deferential abuse of discretion standard of review. [Citation.] A 'trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not "aware of its discretion" to dismiss [citation], or where the court considered impermissible factors in declining to dismiss.' [Citation.] The burden is on the party challenging the sentence to clearly show the sentence was irrational or arbitrary. [Citation.] Further, a sentence will not be reversed merely because reasonable people might disagree. ' " 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' "

In view of his lengthy and serious criminal history, Rollen cannot be considered to fall outside the spirit of the Three Strikes law, even if his most recent criminal conviction was not the most serious of offenses. Consequently, the trial court clearly did not abuse its discretion in denying Rollen's *Romero* motion.

D.      *Rollen's sentence must be modified to reflect only three five-year enhancements*

Rollen contends that the trial court erred in imposing four consecutive five-year terms, one for each of his serious prior felony convictions. According to Rollen, because two of the serious prior convictions arose from the same case, it was error to impose two

26

separate enhancements with respect to those serious prior convictions under section 667, subdivision (a). The People concede that Rollen is correct on this point.

Section 667 requires that a defendant receive "a five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667, subd. (a)(1).) "[T]he requirement in section 667 that the predicate charges must have been 'brought and tried separately' demands that the underlying proceedings must have been formally distinct, from filing to adjudication of guilt." (*In re Harris* (1989) 49 Cal.3d 131,136.)

As the People acknowledge, Rollen's two robbery convictions in 2000 arose from a single case, in which Rollen pled guilty to two counts of robbery and was sentenced to a term of six years in state prison. It was error for the trial court to impose two separate five-year enhancements under section 667 for these robbery convictions. We therefore stay one of the five-year enhancements (see Cal. Rules of Court, rule 4.447).

E.      *Rollen is entitled to have the trial court calculate his presentence custody credits*

Rollen argues that he is entitled to presentence custody credits, which the trial court failed to calculate. The People concede that the trial court erred in failing to calculate the presentence custody credits to which Rollen is entitled.[7] As the People acknowledge, "[t]he sentencing court is responsible for calculating the number of days the defendant has been in custody before sentencing and for reflecting the total credits

_____

7      The abstract of judgment reflects a notation that states, "Department of Corrections to determine credit for time served."

27

allowed on the abstract of judgment." (*People v. Black* (2009) 176 Cal.App.4th 145, 154; see also § 2900.5, subd. (a).)

The parties disagree, however, as to the number of days of credit to which Rollen is entitled. According to the People, Rollen is entitled to 466 presentence custody credits for the time he spent in custody between his arrest and the date he was sentenced. Rollen asserts that this number fails to reflect the number of *conduct* credit days to which he is entitled.

Given the parties' dispute over the number of credits to which Rollen is entitled, and because the trial court is better suited to determine whether "it appears by the record" that Rollen has or has not "satisfactorily perform[ed] labor as assigned" (§ 4019, subd. (b)), or "satisfactorily complied with the reasonable rules and regulations established by the [local custodial authority]" (*id*., subd. (c)), and whether his good behavior while in presentence custody entitles him to conduct credits, we conclude that the trial court should address Rollen's entitlement to and calculation of custody/conduct credits in the first instance.[8]

---

[8] The Penal Code contemplates that the trial court be provided an opportunity to correct any alleged errors in the calculation of presentence custody credits: "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court." (§ 1237.1.)

28

IV.

DISPOSITION

Rollen's sentence is modified to stay one of the section 667 enhancement terms. The case is remanded to the trial court for a determination as to Rollen's entitlement to presentence custody credits. The trial court shall amend the abstract of judgment (1) to reflect the stay of one of Rollen's section 667 enhancements, and (2) to reflect the calculation of Rollen's presentence custody credits. The trial court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitations.

In all other respects, the judgment is affirmed.

AARON, J.

WE CONCUR:

McDONALD, Acting P. J.

O'ROURKE, J.